**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**(Northern Division)**

| | | |
|---|---|---|
| **BRIAN SCHNECK** | * | |
| **RONA SCHNECK** | * | |
| | * | |
| Plaintiffs | * | |
| | * | |
| v. | * | |
| | * | |
| **SUNTRUST MORTGAGE, INC.** | * | Case No.: **11-1878** |
| | * | |
| Defendant | * | |
| | * | |
| | * | **REQUEST FOR JURY TRIAL** |
| | * | |

*********************************************************************

## COMPLAINT

Plaintiffs Rona Schneck and Brian Schneck ("Mr. & Mrs. Schneck"), through their undersigned counsel file this Complaint and Request for Jury Demand and say in support:

## I.  INTRODUCTION

1. The underlying matter involves just one thousands of other similar situations across the State where homeowners are (i) seeking to change and modify their current mortgage loans without requesting additional credit, (ii) complying with all requests of their servicer/lender in making the requests, but (iii) all their reasonable steps are ignored and the homeowners are left with no other option but to seek the assistance of the Courts.

2. These claims concern the utter failure of Defendant SunTrust Mortgage, Inc. ("SunTrust") to comply with Federal and Maryland law related to Mr. & Mrs. Schneck's

reasonable and appropriate requests to modify their mortgage loan subject to this action without seeking additional credit.

3.  Many, but not all, Maryland homeowners facing foreclosure have reasonable and sustainable solutions to their mortgage situation.  Mr. & Mrs. Schneck do have a sustainable solution, yet the Defendant, by and through their authorized agents, are threatening a wrongful foreclosure—otherwise known as an adverse action—on Mr. & Mrs. Schneck and their home and property without having first even complied with federal or state law in the first instance.

4.  Further, if the Defendant and their authorized agents proceed to foreclosure sale of Mr. & Mrs. Schneck's home and property, Mr. & Mrs. Schneck will sustain significantly greater damages and losses as a result through further loss of equity of their home, emotional damages as a result of those proceedings and the Defendant's actions (directly and indirectly through their authorized agents and affiliates).

## II.  PARTIES

5.       Brian T. and Rona L. Schneck are residents of the State of Maryland and the owners of the real property commonly known as 4 Henry's Mill Drive, Berlin, Maryland ("the Property").

6.       Defendant SunTrust Mortgage Inc. ("SunTrust") is a foreign corporation from the State of Virginia with corporate offices located at 901 Semmes Avenue Richmond, VA 23224.

## III.  JURISDICTION & VENUE

7.   This Court  has jurisdiction  asserted  herein for the following reasons:

a. On the basis of diversity of citizenship and in light of the amount in controversy is in excess of $75,000 exclusive of costs. 28 U.S.C. § 1332;

b. The matters asserted herein in light of a federal question presented.  28 U.S.C. § 1331.  In addition this Court has supplemental authority to the Schneck's state law claims related to their federal claim.  28 U.S.C. § 1367.

c. Declaratory and injunctive relief are available pursuant to 28 U.S.C. §§ 2201 and 2202 and Md. Code Ann., §§ 3-401-3-415.

8. Venue is appropriate in this district because the Defendant conducts business within the District and because the conduct complained of occurred within the District.

## IV.  FACTS

### A.    The Foreclosure Crisis

9.  Over the last four years, Maryland and, indeed, the United States have been in a foreclosure crisis.  Recent news reports have established that one in ten American homes is at risk of foreclosure.

10. The number of Maryland properties with foreclosure filings has increased substantially throughout the last four years.

11. Increased foreclosures have a detrimental effect not just on the borrowers who lose unique property and face homelessness, but also on the homes surrounding a foreclosure and, perhaps, neighborhoods that suffer decreased property values and municipalities that lose tax revenue.

12. The foreclosure crisis is far from over.  Economists predict that interest rate resets on the riskiest of lending products will not reach their zenith until sometime in 2011 or beyond.

*See* Eric Tymoigne, Securitization, Deregulation, Economic Stability, and Financial Crisis, Working Paper No. 573.2 at 9, Figure 30 *available at* http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1458413 (citing a Credit Suisse study showing monthly mortgage rate resets).

13. Since the commencement of the crisis, revelations of bogus, false, and deceptive "robo signing" have come to light involving national lenders and mortgage servicers. In Maryland the illegal "robo-signing" issue has even come to the forefront because attorneys and substitute trustees, including those acting on behalf of AHMSI have admitted that they filed bogus documents in hundreds of foreclosure cases filed in state courts.

### B.    Maryland's Response to the Foreclosure Crisis

14. In 2007 at the beginning of the crisis, Governor O'Malley convened a task force of representatives to address the crisis that was then underway. The Maryland Homeownership Preservation Task Force produced a report which aptly summarized the devastating effect of foreclosures on the community as follows:

Foreclosures have a devastating effect on homeowners and the communities in which they live. Frequently, a homeowner who loses his or her home to foreclosure loses the accrued equity. A property sold in a foreclosure sale typically draws a lower price than it would in a regular market sale. In the first half of 2005, Maryland's "foreclosure discount" was 18.8 percent, according the St. Ambrose Housing Aid Center, Inc. This is a tragedy for a growing number of Maryland families.

Extensive damage is felt in neighborhoods and communities across Maryland. Research shows that with every foreclosure on a single family home, the value of homes within an eighth of a mile declines by about nine-tenths of a percent. Property tax revenues decline proportionally, causing a negative impact on state and local governments. A study of foreclosures in Chicago in 2005 estimated that a single foreclosure costs city government up to $5,000 or more.

Foreclosures also bring with them the potential for more violent crime. Research indicates that for every single percentage point increase in the foreclosure rate in a neighborhood, violent crime in that neighborhood increases by about two percent. Foreclosures can lead to vacant or neglected properties, which create an eyesore and become targets for vandalism. This can tip a community from one dominated by homeowners to one dominated by investors.

Of course, the lending industry and investors also take a hit from rising foreclosure rates. Some major lenders have closed their doors, declared bankruptcy or shuttered their subprime lending arms as a result of the waning demand for risky mortgage products in investor markets. Lenders typically lose $50,000 or more on a single foreclosure, according to information from St. Ambrose Housing Aid Center, Inc. The banking industry cites a figure well over $60,000.

Maryland Homeownership Preservation Task Force Report at 12 (November 29, 2007)

*available at* http://www.gov.state.md.us/documents/HomePreservationReport.pdf

(footnotes omitted).


15. To reasonably address and avoid some of the negative consequences of foreclosure, the Task Force Report made nine general recommendations that are relevant to the issues before the Court.  *See Id.* at 40-43.

16. In response to the expanding foreclosure crisis and the Task Force Report, the General Assembly introduced and passed several bills during the 2008 legislative session to change Maryland's foreclosure process and curb certain predatory real estate processes. These bills were passed with nearly complete bi-partisan support. As summarized in the General Assembly's 90 Day Report for the 2008 session:

Until [2008], Maryland's foreclosure process, from the first foreclosure filing to final sale, had been among the shortest in the nation. Maryland is a quasi-judicial State, meaning that the authority for a foreclosure sale is derived from the mortgage or deed of trust, but a court has oversight over the foreclosure sale process. Most mortgages or deeds of trust include a "power of sale" (a provision

authorizing a foreclosure sale of the property after a default) or an "assent to decree" (a provision declaring an assent to the entry of an order for a foreclosure sale after a default). Under the Maryland Rules, it was not necessary to serve process or hold a hearing prior to a foreclosure sale pursuant to a power of sale or an assent to a decree. Consumer advocates contended that the short timeframes and weak notice provisions in State law seriously limited a homeowner's options to avoid foreclosure by, for example, working out a payment plan with the lender or selling the house. In addition, filing a request for an injunction to stop the sale is expensive, time consuming, and not a realistic option for most homeowners.

***Senate Bill 216*** *(Ch. 1)*/***House Bill 365*** *(Ch. 2)*, emergency legislation that took effect April 4, 2008, make a number of significant changes to the foreclosure process in Maryland for residential real property. "Residential property" is defined under the Acts to mean real property improved by four or fewer single-family dwelling units. Except under specified circumstances, the Acts prohibit the filing of an action to foreclose a mortgage or deed of trust on residential property until the later of 90 days after a default in a condition on which the mortgage or deed of trust states that a sale may be made or 45 days after the notice of intent to foreclose required under the Acts is sent.

. . . .

***Senate Bill 217***/***House Bill 360*** define "mortgage fraud" as any action by a person made with the intent to defraud that involves:

• knowingly making, using, or facilitating the use of any deliberate misstatement, misrepresentation, or omission during the mortgage lending process with the intent that it will be relied upon by a mortgage lender, borrower, or any other party to the lending process;

• receiving any proceeds or any other funds in connection with a mortgage closing that the person knows resulted from the aforementioned actions;

• conspiring to violate either of the preceding provisions; or

• filing or causing to be filed in the land records in the county where a residential real property is located any document relating to a mortgage loan that the person knows to contain a deliberate misstatement, misrepresentation, or omission.

Under the Acts, the "mortgage lending process" includes the solicitation, application, origination, negotiation, servicing, underwriting, signing, closing,

and funding of a mortgage loan, as well as the notarizing of any document in connection with a mortgage loan.

Md. Dept. of Legislative Services, The 90 Day Report, A Review of the 2008 Legislative Session, F16-18 (April 11, 2008) *available at* http://mlis.state.md.us/2008rs/90-Day-report/index.htm.

17.  The Maryland Court of Appeals recently adopted in October 2010 an emergency rule to deal with the robo-signing issue based upon the recommendation of the Standing Committee on Rules of Practice and Procedure.  Writing for the Committee the Honorable Alan M. Wilner explained:

The need for these changes emanates from recent revelations regarding the filing in residential foreclosure actions of affidavits as to which the affiant either did not have sufficient knowledge of the facts stated in the affidavit to validly attest to their accuracy or did not actually read or personally sign the affidavit. Preliminary audits have shown that hundreds of such affidavits have been filed in Maryland circuit courts. Up to this point, courts, with good reason and really of necessity, have relied on the accuracy of affidavits, especially when filed by attorneys, unless there is something on the face of the document to suggest otherwise or the validity of the affidavit is challenged. Evidence that has recently come to light, largely through admissions under oath by the affiants themselves, has shaken the confidence that the courts have traditionally given to those kinds of affidavits.

In the Committee's view, the use of bogus affidavits to support actions to foreclose liens on property, apart from prejudice to the homeowners, constitutes an assault on the integrity of the judicial process itself.

Letter from A. Wilner to the Court of Appeals, Oct. 15, 2010.

18. In further response to the foreclosure crisis, Maryland Commissioner of Financial Regulation required for its licensees "a duty of good faith and fair dealing in communications, transactions, and course of dealings with a borrower in connection with the…servicing…of any mortgage loan, including, but not limited to…(3) The duty when

7

servicing mortgage loans to: (a) Promptly provide borrowers with an accurate accounting of the debt owed when borrowers request an accounting; (b) Make borrowers in default aware of loss mitigation options and services offered by the licensee; (c) Provide trained personnel and telephone facilities sufficient to promptly answer and respond to borrower inquiries regarding their mortgage loans; and (d) Pursue loss mitigation when possible." Md. Code Regs. 09.03.06.20.

C.   **Mr. & Mrs. Schneck's Foreclosure Crisis with SunTrust**

19. Brian and Rona Schneck began experiencing difficulties paying their mortgage as the result of job loss and reduction of income in 2008 and 2009.

20. In an effort to be proactive and responsible homeowners, the Schnecks contacted SunTrust mortgage to first seek a modification in June 2010 requesting consideration for any modification of their loan in any other program which would change and modify their current mortgage loan without request seeking additional credit.

21. Mr. and Mrs. Schneck received another letter from SunTrust dated June 25, 2010 requesting that they apply for a modification, and the letter included the application, as well as all the documents they would need to submit to be evaluated for a modification of their loan without request seeking additional credit.

22. Mr. and Mrs. Schneck completed the modification application and submitted the application seeking to adjust their monthly mortgage payment to 31% of their total pretax monthly income.  Included with the request the Schnecks provided SunTrust a hardship letter, 4506T, paystubs, and tax returns to SunTrust in July, 2010. Mrs. Schneck confirmed receipt of the application package with the SunTrust Mitigation Department on July 23, 2010 (hereinafter referred to as "First Modification Request").

23. Mrs. Schneck followed up with SunTrust again on July 27, 2010 for a status update on the First Modification Request.   Ms. Schneck was told by a Loss Mitigation Representative named Shelly that the documents from the First Modification Request were not imaged yet.   Shelly also falsely and deceptively misrepresented in this conversation that Mr. and Mrs. Schneck had to be 30 to 60 days late prior to applying for a modification per Freddie Mac guidelines.

24. Mrs. Schneck contacted SunTrust again for a status update on August 6, 2010 and was told by Phil from the Loss Mitigation Department that the paperwork from the completed First Modification Request had been processed and that Mr. and Mrs. Schneck's status was listed as active.

25. Mrs. Schneck spoke with Cindy in the Loss Mitigation Department on August 17, 2010. Cindy requested additional paystubs from both Mr. and Mrs. Schneck, and a bank statement.   Cindy also represented at that time that the First Modification Request was being reviewed by Freddie Mac, and was still showing as active.   Upon information and belief based upon public disclosures this representation was also false as Freddie Mac never reviewed modification applications at this stage.

26. On August 23, 2010, Mrs. Schneck faxed to Cindy copies of her and her husband's two most recent paystubs, as well as a copy of their most recent bank statement.   Mrs. Schneck wrote on her fax cover page that she had waited until August 23rd to fax the information because she wanted her husband's direct deposit paycheck to post in the bank account.   Mrs. Schneck received a fax confirmation sheet, confirming her fax had gone through to SunTrust on the same date.

27. On or about August 26, 2010, Mrs. Schneck spoke with Anna in the Loss Mitigation Department to follow up on the information she faxed on August 23rd. Anna stated that after 60 days of receipt of the First Modification Request, the Schnecks' status could be escalated if no action had occurred.

28. On or about September 17, 2010 Mrs. Schneck followed up with SunTrust on the status of her First Modification Request. She spoke with Danny at the Loss Mitigation Department, who stated that she could escalate the modification, however Cindy had not updated the First Modification Request paperwork with the updated information Ms. Schneck submitted on August 23, 2010.

29. On or about September 20, 2010 Ms. Schneck spoke with Kevin from SunTrust, who had no knowledge about escalating the First Modification Request application, but he did falsely represent that there had been no activity on the account for 60 days despite the activity noted above. Kevin said that a representative from SunTrust would contact Mrs. Schneck within 48 hours. No one ever called her back.

30. Mrs. Schneck called SunTrust on September 24, 2010 and spoke with Bobby. He said that Cindy had finally imaged the documents Mrs. Schneck had faxed over in August related to the First Modification Request, but there were no additional updates on the First Modification Request at that time.

31. After having no success in reaching a representative of SunTrust on October 11 or October 12, 2010, Mrs. Schneck sent a letter to the Loss Mitigation Department of SunTrust, outlining her numerous attempts to contact SunTrust and the conflicting information she was given each time. She also sent copies of this letter to Freddie Mac, the Office of the Comptroller of Currency, and HOPE Now.

A.      Mr. and Mrs. Schneck never received a response from Freddie Mac regarding their letter.  Mrs. Schneck did receive a phone call from Roberta at HOPE Now, stating that since the Schnecks were denied by SunTrust, there was nothing that HOPE Now could do for them.

B.      Mr. and Mrs. Schneck receive a letter from the Office of the Comptroller of Currency which stated it had no regulatory authority over SunTrust Mortgage, Inc.  The letter also stated that their letter would be forwarded to the appropriate government agency, the Federal Trade Commission.

C.      Mr. and Mrs. Schneck then received a letter from the Federal Trade Commission offering no resolution to the Schnecks until a "pattern" of complaints were filed that is showed a pattern of possible violations for more than one person.

32. Ms. Schneck spoke with Maxine McCluen in SunTrust's Loss Mitigation Department on October 13, 2010.   Ms. McCluen followed up the conversation by emailing Ms. Schneck a list of updated documentation that she needed to fax to SunTrust, including two current bank statements, proof of one month's income from both borrowers, proof of imminent default, and any other additional information Ms. Schneck felt may be needed.

33. The next day, October 14, 2010, Ms. Schneck faxed to Ms. McCluen all of the requested information related to their request for a modification of their mortgage loan which would adjust their monthly mortgage payment to 31% of their total pretax monthly income.  The Schnecks also retained a copy of the fax confirmation sheet showing that the fax went through (hereinafter referred to as "Second Modification Request").

34. On or about the first week of November, 2010, Mr. and Mrs. Schneck received a letter dated October 29, 2010 from SunTrust, inviting them to apply for another modification to

change and modify their current mortgage loan without requesting additional credit.   It

requested the same information as the letter dated June 25, 2010.

35.   At the beginning of January 2011, Mr. and Mrs. Schneck received a letter from SunTrust

dated December 30, 2010, falsely stating that their request for modification was denied

because requested information was not provided when in fact Mr. and Mrs. Schneck had

provided all the information that had been requested.   Further, the January2011 letter did

not detail <u>any</u> items were not provided.

36.   On January 8, 2011 Mr. and Mrs. Schneck reapplied again for another modification of

their mortgage loan modification to change and modify their current mortgage loan,

without requesting additional credit, by adjusting their monthly mortgage payment to

31% of their total pretax monthly income.   They provided SunTrust another complete

application and also provided paystubs and a hardship letter (hereinafter referred to as

"Third Modification Request").   No acknowledgement or denial was ever received by

Mr. & Mrs. Schneck regarding this application.

37.   Having notified SunTrust on multiple occasions of their complaints without SunTrust

ever honestly responding over the course of six months, as detained above, the Schnecks

retained counsel to assist them to have their modification requests meaningfully

considered.   As a result of having to resort to obtaining counsel in January 2011, the

Schnecks have incurred further damages and losses related to that representation through

legal fees, traveling costs to meet with their attorneys, and other costs.

38.   On behalf of Mr. and Mrs. Schneck, counsel for Mr. & Mrs. Schneck prepared and

submitted to SunTrust on March 24, 2011 by fax a completed fourth application

modification of Mr. and Mrs. Schneck's mortgage loan modification to change and

modify their current mortgage loan, without requesting additional credit, by adjusting their monthly mortgage payment to 31% of their total pretax monthly income, (hereinafter referred to as "Fourth Modification Request").   No acknowledgement or denial of this request has ever been received by Mr. and Mrs. Schneck or their counsel regarding this application.

39. On June 6, 2011, SunTrust sent a letter to Mr. & Mrs. Schneck threatening foreclosure of Mr. & Mrs. Schneck's home and property as well as assessing "inspection" costs and fees onto Mr. & Mrs. Schneck's account.

40. Having no where else to turn for help, Mr. & Mrs. Schneck are left to seek this Court's help in preventing an injustice by SunTrust of the illegal, unfair, and deceptive acts of SunTrust described herein and ongoing.   These acts have damaged Mr. & Mrs. Schneck by incurring legal fees, damage to their credit, lost time from work, and emotional damages from stress, sleeplessness, anxiety, fear, etc.

**COUNT I:  EQUAL CREDIT OPPORTUNITY ACT, 15 U.S.C. § 1691 *ET SEQ*.**

41. The Schnecks reiterate and incorporate every allegation above as if set forth herein in full and add:

42. The Schnecks are "applicants" as governed by ECOA, 15 U.S.C §1691a(b).

43. SunTrust is a "creditor" as governed and defined by ECOA, 15 U.S.C. §1691(a)(e) at all times relevant hereto.

44. 15 U.S.C §(d)(1) provides that "within thirty days…after receipt of a completed application for credit, a creditor shall notify the applicant of its action on the application." 15 U.S.C. §1691(d)(1).

45. The accompanying Regulation B, issued by the Board of Governors of the Federal Reserve System pursuant to ECOA, further provides: "A creditor shall notify an applicant of action taken within: (i) 30 days after receiving a completed application concerning the creditor's approval of, counteroffer to, or adverse action on the application." 12 C.F.R §202.9(a)(1)(i).

46. Additionally, 15 U.S.C. §1691(d)(2) requires "that each applicant against whom "adverse action" is taken shall be entitled to a statement of reason for such action from the creditor." 15 U.S.C. §1691(d)(2).

47. 15 U.S.C. §1691(d)(6) defines "adverse action" as a denial or revocation of "credit", a change in terms of an existing credit arrangement, or a refusal to grant credit in substantially the amount or substantially the terms requested." 15 U.S.C. §1691(d)(6)

48. The term "credit" means the right granted by a creditor to a debtor to defer payment of a debt or to incur debts and defer its payment…and defer payment thereof. 15 U.S.C. § 1691a(d); 12 C.F.R. §202.2(j).

49. The Schnecks' applications for a loan modification, and in the alternative refinancing, was an application for "credit" as defined by 15 U.S.C. § 1691a(d) and 12 C.F.R. §202.2(j).

50. The Schnecks provided SunTrust with multiple complete applications for credit including the First Modification Request, Second Modification Request, Third Modification Request, and Forth Modification Request as described above.

51. SunTrust failed to evaluate the Schnecks' loan modifications in good faith and to make any determination on the Schneck's applications after receiving their completed loan modification applications.

52. Instead, Defendant grossly ignored its responsibility to respond to the Schnecks' loss mitigation requests and is proceeding to an illegal foreclosure action.

53. In failing to evaluate the Schnecks' application for credit in a manner required by ECOA, SunTrust effectively denied the Schnecks credit, and thereby took "adverse action" – as defined by ECOA – on the Schnecks' application.  By threatening foreclosure of the Schnecks' home and property SunTrust also took an "adverse action" related to the Schneck's multiple requests for a modification.

54. The Schnecks never received a truthful written notice from SunTrust or anyone else of the adverse action taken on their application for a loan modification.

55. Additionally, SunTrust's written December 2010 notification to the Schnecks was not in compliance with the notification requirements set forth in ECOA, 15 U.S.C. §1691(d)(2), as the notification failed to provide Plaintiff with a specific statement of truthful reasons for the adverse action taken by failing to include the documents alleged to be missing from the Schnecks' application.

56. The above failure of SunTrust to notify the Schnecks of the adverse action taken on their applications within thirty days from receipt of their completed applications for credit as mandated by 15 U.S.C §1691(d)(1), §1691(d)(2) and 12 C.F.R §202.9(a)(1)(i) were substantive violations of ECOA.

57. As a result of the above ECOA violations, the Schnecks have suffered the following substantial actual damages in addition to those described above including ¶¶ 37 and 40:

    a.   the loss of their rights to explain or quickly rectify and address any errors or problems in their application for credit;

    b.   incurred legal fees and expenses;

    c.  the loss of the credit itself; and

    d.  frustration, anger, humiliation, fear, embarrassment and other emotional and mental anguish connected to the foreclosure on their home.

WHEREFORE as a result of the above ECOA violations, the Schnecks prey for the Court to award them:

A.  Actual damages pursuant to 15 U.S.C. §1691(e)(a) in a sum of no less than $75,000 for each plaintiff;

B.  Punitive damages of $10,000 for each plaintiff pursuant to 15 U.S.C. §1691e(b);

C.  An award of reasonable attorneys fees and costs pursuant to 15 U.S.C. §1691(e)(d) and 12 C.F.R. §202.16(b); and

D.  Equitable relief by entering an Order declaring that the Defendant's conduct is a violation of ECOA, insofar as it failed to provide notice to the Schnecks of its action on their completed application for credit within thirty day from receipt of their applications for credit to modify their mortgage loan; and requiring the Defendant to deliver ECOA complaint notices in all future instances.

## COUNT II: MARYLAND EQUAL CREDIT OPPORTUNITY ACT ("MD ECOA"), MD. CODE ANN. COM. LAW §12-701 *ET SEQ.*

58. The Schnecks reiterate and incorporate every allegation above as if set forth herein in full and add:

59. The express finding and purpose of the General Assembly in enacting the Maryland Equal Credit Protection Act was to "insure that the various financial institutions and other persons and firms engaged in the extension of credit exercise their responsibility to make credit available with fairness [and] impartiality."  Md. Code, Comm. Law § 12-702(a).

60.   Under the Equal Credit Opportunity Act as incorporated in Maryland, "Any violation of the federal Equal Credit Opportunity Act…is a violation of the provisions of this subtitle" *Md. Code Ann. Com. Law* §12-704(3). As demonstrated above, SunTrust has violated ECOA.

61.   Pursuant to *Md. Code Ann. Com. Law* §12-707(a) "any creditor who violates any provisions of this subtitle is liable to the applicant in an amount equal to the sum of any actual damages".

62.   *Md. Code Ann. Com. Law* §12-707(b) provides that "any creditor who fails to comply with any requirement imposed under this subtitle shall be liable to the aggrieved applicant for punitive damages in an amount not greater than $10,000, as determined by the court, in addition to any actual damages."

WHEREFORE, as a result of the above MD ECOA violations, the Schnecks prey for the Court to award them:

A.   Actual damages in a sum of no less than $75,000 each for their actual damages described above in ¶¶ 37,  40, and 57 pursuant to *Md. Code Ann. Com. Law* §12-707(a);

B.   Punitive damages pursuant to *Md. Code Ann. Com. Law* §12-707(b) in the sum of $10,000 each;

C.   Reasonable attorney fees and costs *Md. Code Ann. Com. Law* §12-707(e); and

D.   Equitable relief declaring that Defendant has violated MD ECOA by declaring that the Defendant's conduct is a violation of MD ECOA, insofar as it failed to provide notice of its action on the Plaintiffs' completed applications for credit within thirty

days from receipt of their applications to modify their mortgage loan and to require

delivery of ECOA Complaint notices in all future instances.

### COUNT III -- VIOLATION OF THE MARYLAND
### CONSUMER DEBT COLLECTION ACT
### MD CODE, COMM. LAW, § 14-201 *et seq.*

63.  The Schnecks reiterate and incorporate every allegation above as if set forth herein in

full and add:

64. By threatening an intent to foreclose, SunTrust has acted as a collector as that term is

defined by § 14-201(b) of MD. CODE, COMM. LAW.

65. Mr. & Mrs. Schneck are persons as defined by § 14-201(d) of MD. CODE, COMM. LAW.

66. The underlying mortgage transaction and threat of foreclosure related to this complaint

constitutes a "consumer transaction" as defined by § 14-201(c) of MD. CODE, COMM.

LAW.

67. SunTrust has have claimed, attempted, or threatened to enforce a right with knowledge

that their right did not exist under Maryland or Federal law until they complied with

ECOA, the Maryland Equal Credit Protection Act, and Md. Code Regs. 09.03.06.20.

68. Mr. & Mrs. Schnecks' damages as alleged herein were proximately caused by SunTrust's

actions including damages for emotional distress or mental anguish suffered with or

without accompanying physical injury as well as those damages described in ¶¶ 37,  40,

and 57 above.

WHEREFORE, Mr. & Mrs. Schneck pray for the following relief against SunTrust for

their violations of the Maryland Consumer Debt Collection Act:

A.  A money judgment of all damages caused by SunTrust's actions, directly or

indirectly, in the sum of $75,000 per Plaintiff;

B.  Their costs including attorneys' fees as well as pre- and post-judgment interest;

C.  Such other and further relief as the nature of their cause may require.

## COUNT IV – VIOLATION OF MARYLAND'S CONSUMER PROTECTION ACT, MD. CODE ANN. COM. LAW § 13-101 *et. seq.*

69.  The Schnecks reiterate and incorporate every allegation above as if set forth herein in full and add:

70.  The mortgage loan transactions and foreclosure practices as set forth herein of the Defendant against the Plaintiffs are governed by the Consumer Protection Act, MD. CODE ANN. COM. LAW § 13-101 *et. seq.*

71.  Section 13-303 prohibits unfair or deceptive trade practices in the extension of consumer credit or collection of consumer debts.  The consideration of a loan modification and threat of a foreclosure action involves both the extension of credit and the collection of debts.  Section 13-316 requires servicers like SunTrust to respond to inquiries from consumers within 15 days.

72.  The Maryland Consumer Protection Act defines unfair or deceptive trade practices to include, inter alia, the following: (a) False, falsely disparaging, or misleading oral or written statement, visual description, or other representation of any kind which has the capacity, tendency, or effect of deceiving or misleading consumers; and (b) Failure to state a material fact if the failure deceives or tends to deceive.

73.  By engaging in the acts and omissions set forth above, by making the misrepresentations set forth above, and by failing to disclose material facts where the failure to do so deceived or tended to deceive, the Defendant has committed unlawful or deceptive trade practices in violation of the Maryland Consumer Protection Act.  Sec. 13-301(1) and (3) and Sec. 13-303(4) ("MCPA").

74. The Defendant's' conduct, as set forth above, had the capacity, tendency or effect of deceiving Mr. & Mrs. Schneck who in fact were deceived or misled, causing injury and loss through the unfair or deceptive prosecution, based upon incomplete and bogus responses to their requests for modifications of their loans, or threat of prosecution of a foreclosure action by Defendant.

75. Mr. & Mrs. Schneck's damages as alleged herein were proximately caused by SunTrust's actions including damages for emotional distress or mental anguish suffered with or without accompanying physical injury as well as those damages described in ¶¶ 37, 40, and 57 above.

WHEREFORE, Mr. & Mrs. Schneck pray for the following relief against SunTrust for their violations of the Maryland Consumer Protection Act:

A. They be awarded as part of this claim a sum of no less than $75,000 per Plaintiff which represents their compensatory damages as a result of the Defendant's direct and indirect, unfair or deceptive practices as described herein including the Defendant's failure to comply with ECOA, the Maryland Equal Credit Protection Act, and Md. Code Regs. 09.03.06.20;

B. They be awarded their reasonable attorney's fees and costs; and

C. That their claim should include such other and further relief as the Court deems just and proper.

## COUNT V – MARYLAND MORTGAGE FRAUD PROTECTION ACT, MD. ANN. CODE, REAL PROP. § 7-401 MD. REAL PROP., *et seg.*

76. The Schnecks reiterate and incorporate every allegation above as if set forth herein in full and add:

77. The Maryland Mortgage Fraud Protection Act, Md. Ann. Code, Real Prop. § 7-401 MD. REAL PROP., *et seq.* ("MMFPA") governs the relationship between the Defendant and Plaintiffs.

78. MD ANN. CODE., REAL PROP. § 7-401 (c) provides: "Homeowner" means a record owner of residential real property. The Plaintiffs are record owners of the residential property in question and therefore are Homeowners.

79. MD ANN. CODE., REAL PROP. § 7-401 (e) provides "Mortgage lending process…includes [t]he…servicing…of a mortgage loan."

80. MD ANN. CODE., FINANCIAL INSTITUTIONS CODE. § 11-501 (k)(1) provides: "Mortgage loan" means any loan or other extension of credit that is: (i) Secured, in whole or in part, by any interest in residential real property in Maryland; and (ii) If for personal, household or family purposes, in any amount."

81. The MMFPA works to protect the interests of all parties to mortgage issues in Maryland from misstatements, misrepresentations and omissions; in this instance the MMFPA works to protect borrowers like Mr. & Mrs. Schneck from mortgage companies like the Defendant  and ensure a level, fair playing field between all borrowers and professionals.

82. Mr. & Mrs. Schneck are homeowners in the Mortgage Lending Process as defined by the MMFPA since the actions in dispute in this lawsuit involve the servicing of their residential mortgage loans as it relates to a foreclosure action or threat of foreclosure which is an attempt to collect a certain sum on the mortgage transaction.

83. MD ANN. CODE., REAL PROP. § 7-401 (d) provides:

"Mortgage fraud" means any action by a person made with the intent to defraud

that involves:

1.  Knowingly making any deliberate misstatement, misrepresentation or omission during the mortgage lending process with the intent that the misstatement, misrepresentation or omission be relied on by a mortgage lender, borrower or any other party to the mortgage lending process;

2.  Knowingly using or facilitating the use of any deliberate misstatement, misrepresentation, or omission during the mortgage lending process with the intent that the misstatement, misrepresentation, or omission be relied on by a mortgage lender, borrower, or any other party to the mortgage lending process.

3.  Receiving any proceeds or any other funds in connection with a mortgage closing that the person knows resulted from a violation of item (1) or (2) of this section;

4.  Conspiring to violate any provisions of item of (1), (2) or (3) of this section…

84.  The Defendant has committed Mortgage Fraud by:

    i.  Knowingly making, as described herein, deliberate misstatements, misrepresentations and omissions during the mortgage lending process, including failing to respond to the Plaintiffs' requests for a modification or change of their mortgage loans, with the intent that the misstatements, misrepresentations and omission be relied on by the Plaintiffs and and the general public;

    ii.  Knowingly using or facilitating, as described herein, the use of any deliberate misstatements, misrepresentations, and omissions during the mortgage lending process, including the state court foreclosure actions it has commenced and carried out, with the intent that the misstatements, misrepresentations, and omissions be relied on by the Plaintiffs.

85.  Mr. & Mrs. Schneck have been damaged by the Defendant's deliberate

misstatements, misrepresentations, and omissions during the mortgage lending process as stated herein including ¶¶ 37,  40, and 57 above..

86. MD ANN. CODE., REAL PROP. CODE. § 7-401 (g) provides:

Pattern of mortgage fraud means two or more incidents of mortgage fraud that:

- Involve two or more residential real properties; and

- Have similar intents, results, accomplices, victims, or methods of commission or otherwise are interrelated by distinguishing characteristics.

87. Upon information and belief the Defendant has engaged in a Pattern of Mortgage Fraud by committing similar acts against two or more Maryland residential properties with similar intents, results and methods of commission as that which was committed by Defendant.  This belief is based upon other matters pending in this and other courts of a similar nature involving SunTrust.

WHEREFORE, Mr. & Mrs. Scneck request the following on their behalf based upon the Defendant's violations of the MMFPA:

A.   They be awarded as part of their claims the sum of no less than $75,000 each which represents  their compensatory damages as a result of the Defendant's illegal practices and misrepresentations;

B.  The Plaintiffs be awarded three times their actual damages for the Defendant's willful and knowing violations;

C.  They be awarded as part of the claim their reasonable attorney's fees and costs; and

D.  That their claim should include such other and further relief as the Court deems just and proper.

Respectfully Submitted,


_____//s//_____

Phillip Robinson

_____//s//_____

Anthony DePastina
Civil Justice Inc.
520 W. Fayette Street, Suite 410
Baltimore, MD 21201
Telephone (410) 706-0174
Facsimile (410) 706-3196